1  SULLIVAN, HILL, LEWIN, REZ & ENGEL
   A Professional Law Corporation
2    James P. Hill, SBN 90478
     Christopher V. Hawkins, SBN 222961
3  550 West "C" Street, Suite 1500
   San Diego, California 92101
4  Telephone: (619) 233-4100
   Fax Number: (619) 231-4372
5
   Attorneys for William A. Leonard, Jr.,
6  Chapter 11 Trustee

7

8              UNITED STATES BANKRUPTCY COURT
                  Southern District Of California
9

10 In re                        )  LEAD CASE NO. 04-05832-LA
                                 )  Chapter 11
11 XELAN, INC.,                  )
                                 )  **TRUSTEE'S CHAPTER 11 STATUS**
12         Debtor.               )  **REPORT**
                                 )
13 In re                        )  Date:  September 28, 2006
                                 )  Time:  2:00 p.m.
14 PYRAMIDAL FUNDING SYSTEMS,    )  Dept:  Two
   INC.,                         )         Hon. Louise DeCarl Adler
15 (Case No. 04-05833)           )
                                 )
16         Debtor.               )
                                 )
17                               )
                                 )
18 In re                        )
                                 )
19 XELAN FINANCIAL PLANNING, INC.,)
   (Case No. 04-05834)           )
20                               )
                                 )
21         Debtor.               )
                                 )
22 In re                        )
                                 )
23 XELAN PENSION SERVICES, INC., )
   (Case No. 04-05835)           )
24                               )
                                 )
25         Debtor.               )

26

27 ///

28 ///

                         1

RECEIVED

SEP 1 8 2006

Southfield Legal Dept.

1      William A. Leonard, Jr. ("Trustee"), the Chapter 11 trustee of the above-captioned debtors

2 (collectively, "Debtors"), hereby files his Chapter 11 Status Report.

3 **I.**

4 **INTRODUCTION**

5      The Trustee and his professionals continue to make enormous progress in these jointly-

6 administered cases, as described more fully below. The Trustee intends to file a plan in these cases

7 upon resolution of key claims, toward which end the Trustee continues to make substantial headway.

8 Nevertheless, pursuant to section 1121 of Title 11 of the United States Code ("Bankruptcy Code"),

9 the plan exclusivity period has expired, and any party in interest is free to propose its own plan of

10 reorganization or liquidation. The Trustee and his professionals remain willing to work with any

11 such party, but to date, no such party has appeared. The estates are in no danger of becoming

12 administratively insolvent, and as noted below with respect to a pending agreement with the Internal

13 Revenue Service ("IRS") on its priority claim, satisfaction of administrative expenses and other

14 priority claims should not be a bar to plan confirmation. See 11 U.S.C. § 1129(a)(9). The Trustee

15 intends to continue his methodical course of action described below, namely, to winnow claims

16 through the objection process; to seek recoveries where available; to negotiate with key parties in

17 interest for resolution of "lynch pin" claims and interests; and to collect, account for and disburse the

18 renewal commission income -- all with the aim to achieve as close to a 100 percent payout to general

19 non-insider unsecured creditors as possible.

20 **II.**

21 **THE ASSET SALE AND RELATED MATTERS**

22      On June 30, 2004 (the "Petition Date"), Xelan, Inc. ("Xelan"), Pyramidal Funding Systems,

23 Inc. ("Pyramidal"), Xelan Financial Planning, Inc. ("Financial"), and Xelan Pension Services, Inc.

24 ("Pension") filed the above-captioned bankruptcy cases under Chapter 11 of the Bankruptcy Code.

25 On November 23, 2004, the Court entered its order appointing Mr. Leonard as the Chapter 11 trustee

26 in the cases.

27 / / /

28 / / /

2

A.    **The Business Asset Preservation Agreement**

     1.    **Wavier of BAPA Management Fee**

     Prior to the Trustee's appointment, on August 4, 2004, the Court entered an order approving a Business Asset Preservation Agreement ("BAPA"), under which Greenbook Financial Services, Inc. ("Greenbook") agreed to operate the businesses of the Debtors. Just a little over three months later, at about the time of the Trustee's appointment, Greenbook submitted its notice of intent to resign its position under the BAPA, which it was legally entitled to do. Had such termination become effective, Greenbook would have been entitled to be paid its negotiated BAPA management fee of 10 percent of the Debtors' revenues. Such fee would have been approximately $570,000 at the time Greenbook gave notice, and almost $800,000 by the time a sale of assets closed. Furthermore, had Greenbook's termination become effective, the value ultimately realized from the asset sale described below would have been <u>substantially</u> reduced, as no substitute buyer capable of running the Debtor's businesses was "waiting in the wings" to do so, and the assets likely would have deteriorated. More importantly, Greenbook already had business relationships established with the core group of the Debtors' financial counselors, and according to the terms of the BAPA, had a contractual right to compete with the Debtors upon termination of the BAPA, which -- for better or worse -- was negotiated, approved and put into place before the Trustee entered the scene. The Trustee negotiated with Greenbook, successfully securing its commitment to remain as operator, and ultimately concluded the asset sale on revised, improved terms. As part of the sale, Greenbook waived any claim to its BAPA management fee, which resulted in the Debtors' estates retaining the $800,000 in otherwise-payable BAPA management fee.

     2.    **Renegotiated Terms Regarding Allocation of Expenses**

     At the time of the Trustee's appointment, Greenbook was charging virtually <u>all</u> of its own operating expenses against the Debtors under the BAPA, including executive salaries, rent, utilities, marketing expenses, and other overhead. Upon his appointment, the Trustee disputed such practice, and asserted that Greenbook was entitled to expense under the BAPA <u>only</u> those charges that were <u>directly related</u> to the preservation of the Debtors' assets. Had Greenbook prevailed on its position, at the time of the sale closing, the estates would have owed Greenbook an additional $980,000 in

1   BAPA consideration. The Trustee negotiated a resolution of this dispute. Upon the closing of the

2   asset sale described below, Greenbook not only waived its claims arising out of this disputed

3   interpretation of the BAPA, but also agreed to pay the estate an additional $425,000 in BAPA

4   consideration at the time of sale closing, and an additional amount to be determined upon a final

5   BAPA accounting. This latter amount turned out to be approximately $275,000, which has now

6   been paid. Accordingly, the Trustee's successful resolution of this issue resulted in a "swing" of

7   almost $1,700,000 in favor of the Debtors' estates (from Greenbook's assertion that it was <u>owed</u>

8   $980,000 in BAPA consideration, instead to the estates' <u>receipt</u> from Greenbook of $425,000

9   followed by $275,000 more in BAPA consideration).

10         **3.    <u>Greenbook's Comingling of Debtors' Assets</u>**

11         After his appointment, the Trustee discovered that during Greenbook's tenure under the

12   BAPA, Greenbook had not been maintaining separate accounting records for each of the four

13   Debtors, but rather had been commingling the assets and liabilities. Because Greenbook had been

14   appointed under the BAPA only one month into these cases, essentially <u>all</u> of the Debtors' post-

15   petition financial records were inaccurate and unreliable. The Trustee could not fulfill his duties as

16   trustee based on such records, and counsel for the United States Trustee was strenuously objecting to

17   a continuance of such practice.

18         Based on these facts, the Trustee and his professionals undertook significant efforts to

19   investigate and resolve issues arising from the faulty post-petition accounting of the Debtors' assets

20   and liabilities, and to revise and update the Debtors' accounting records accordingly. This

21   undertaking was absolutely necessary. The Trustee could not fulfill his duties without a set of books

22   and records on which he could rely. He could not prepare and file monthly operating reports without

23   reliable accounting records. He could not prepare and file tax returns (which have since been done).

24   He could not properly track receipts and allocate expenses. Reliable accounting records are crucial

25   to nearly everything the Trustee has done and continues to do in the course of these cases. And as

26   discussed below, the Trustee could not sit back and hope that the four Debtor estates were one day

27   substantively consolidated. Moreover, the accounting work performed may in fact help substantiate

28   the need for substantive consolidation consistent with the "enterprise" manner in which the Debtors

4

1  were operated as a group and as part of the larger Xelan "family of companies" enterprise, inclusive

2  of various non-debtor Xelan companies.  Accordingly, the Trustee had no choice but to undertake

3  the effort to bring the Debtors' accounting records up to par.

4  **B.     Asset Purchase Agreement**

5         Before the Trustee's appointment, and even before these cases were filed, the Debtors in

6  Possession had negotiated a sale of their assets to Greenbook, subject to Court approval.  On August

7  4, 2004, the Court entered an order approving certain procedures for such sale.  Due to various

8  objections raised, as well as the placement of various Xelan-affiliated businesses into temporary

9  receivership, the sale was delayed and ultimately did not close on the originally-noticed terms.

10        After the Trustee's appointment, he negotiated extensively with Greenbook to improve and

11 clarify the terms of the proposed sale.  These negotiations spanned many months, and ultimately led

12 to greatly-improved deal terms for the Debtors' estates.

13        On August 3, 2005, the Trustee filed his Motion for Authority (1) to Sell Assets Free and

14 Clear and Not in the Ordinary Course of Business, Subject to Overbid; (2) to Assume and Assign

15 Counselor Contracts; and (3) to Compromise and Settle Claims (the "Sale Motion").  Various

16 objections were filed to the Sale Motion, to which the Trustee and his professionals responded

17 extensively.  The Court conducted an initial hearing on the Sale Motion, followed by an evidentiary

18 hearing on September 20, 2005, at which the Court approved the sale to Greenbook, as well as the

19 assumption and assignment of certain contracts discussed below.

20        The most significant improvement in the restructured sale was the retention by the estates of

21 the Pyramidal renewal income, which was to have been transferred to Greenbook under the

22 previously noticed sale.  This change in terms resulted in the estates retaining approximately

23 $2,400,000 in Pyramidal renewal income collected at the time of the hearing on the Sale Motion, and

24 an additional amount (estimated at approximately $2,400,000) which has been and will be collected

25 between the approval hearing and 2028.  Additionally, the estates did not transfer (as previously

26 contemplated by the Debtors in Possession) but rather retained all cash on hand, all intercompany

27 accounts, and all causes of action and claims for relief, including claims under Chapter 5 of the

28 Bankruptcy Code.  Finally, the Trustee's restructured sale included the $1,700,000 "swing"

1  described above arising from the renegotiated interpretation of the BAPA. All of these components

2  of additional value retained by the estates will dramatically improve the end result of these cases

3  from the perspective of creditors.

4  **C.    Financial Counselor Claims**

5       Prior to their bankruptcy filings, the Debtors entered into numerous contracts (collectively,

6  the "Counselor Contracts") with various financial counselors (collectively, the "Counselors")

7  relating to the Counselors' clients' acquisition of various financial products through the Debtors or

8  with the Debtors' assistance. As part of the asset sale, Greenbook insisted that a critical mass of

9  Counselor Contracts be assumed and assigned to it, and that all defaults under such core group of

10  contracts be cured. The Trustee negotiated extensively with the Counselors regarding such

11  assumption and assignment. The Court's order entered October 25, 2005 approving the asset sale to

12  Greenbook also approved the assumption and assignment to Greenbook of the contracts of certain

13  Counselors who agreed to work exclusively with Greenbook. On January 10, 2006 the Court

14  entered an order approving the assumption and assignment of the contracts of a second group of

15  Counselors who signed up to work with Greenbook on a non-exclusive basis. More recently, on

16  August 8, 2006, the Trustee filed a notice of intent to enter into settlements with yet a third group of

17  financial counselors -- this group unaffiliated with Greenbook.

18       To date, under the two approval orders, the Trustee has assumed and assigned to Greenbook

19  the Counselor Contracts of approximately 86 Counselors. Such assumption and assignment has

20  resulted in the resolution (i.e., withdrawal) of approximately $10,000,000 in claims filed against the

21  estates, some significant portion of which likely would have been accorded administrative priority

22  status if allowed. The assumption and assignment agreements avoided protracted and costly

23  litigation in which the estates would have borne significant exposure. Additionally, as part of the

24  Court-approved assumptions and assignments, each of the electing Counselors agreed to contribute

25  20 percent of his or her commissions to fund the settlement agreement with Viatical Liquidity, LLC

26  / / /

27  / / /

28  / / /

6

1    ("Viatical Liquidity").  Through June 30, 2006, such Counselors have contributed nearly $840,000[1]

2    towards the funding of the Viatical Liquidity settlement (and continue to contribute more each

3    quarter), thus reducing Viatical Liquidity's claim against the Xelan estate by a corresponding

4    amount.

5    **D.    Viatical Liquidity Claims**

6        Prior to the Petition Date, various Counselors sold viatical contracts to investors with the

7    assistance of the Debtors and related Xelan entities.  The viatical contracts did not perform as

8    expected.  Viatical Liquidity was established as an independent entity to resolve claims asserted by

9    the viatical contract investors by taking on the ownership of viatical insurance contracts and

10   assuming related administrative and insurance premium costs.  Xelan, on behalf of Xelan Investment

11   Services, Inc. ("XIS"), an affiliated non-debtor entity, and various Counselors had agreed to pay 20

12   percent of asset management fees retained and 20 percent of commissions earned through XIS,

13   Xelan, or Pyramidal, respectively, to Viatical Liquidity to allow Viatical Liquidity to pay its

14   administrative and insurance premium costs and ultimately to allow it to make promised returns to

15   its viatical contract investors.

16       On June 18, 2004, Viatical Liquidity filed its own bankruptcy case, and later filed a proof of

17   claim against the Xelan estate in the amount of $32,000,000.  The Viatical Liquidity claim, if

18   allowed, represents a potential dead end to successful reorganization and meaningful distributions to

19   creditors of the Xelan estate.  The Trustee negotiated with Viatical Liquidity, and ultimately reached

20   a proposed settlement.  Under the settlement, the Debtors and various electing Counselors agreed to

21   pay over to Viatical Liquidity 20 percent of commissions earned to fund the settlement.  The

22   settlement has been approved by Judge Hargrove in the Viatical Liquidity bankruptcy case, and has

23   thus become effective as to Viatical Liquidity and the participating electing Counselors, who have

24   contributed nearly $840,000 to the settlement thus far.  The Trustee moved for Court approval of the

25

26   [1] This figure includes both (i) funds already paid to VLLLC, and (ii) funds currently escrowed by the Trustee and
     earmarked for payment to VLLLC after the conclusion of the next calendar quarter.  Additionally, in the event that the
27   Debtors' four estates are substantively consolidated in the future, the Trustee intends to re-urge his previously-filed
     motion to approve the Trustee's entry on behalf of the Debtors into the settlement with Viatical Liquidity.  He continues
28   to earmark and escrow 20 percent of the estates' renewal income for future contribution to the settlement, and as of June
     30, 2006, holds $438,216.12 in such funds.

7

1  Viatical Liquidity settlement in the Xelan bankruptcy cases. Objections were filed to the Trustee's

2  motion, and the Trustee agreed to defer his motion until after he addresses substantive consolidation

3  or other resolution in the Xelan Debtors' cases. The Trustee has earmarked and escrowed 20 percent

4  of the estates' share of the renewal commission income for settlement payments, and as of June 30,

5  2006 has $438,216.12 on deposit in Qualified Settlement Funds, pursuant to the Court's order

6  entered September 20, 2005. If the settlement agreement with Viatical Liquidity is ultimately

7  approved by this Court, the $32,000,000 claim of Viatical Liquidity will be satisfied by transfer of

8  this fund to the Viatical Liquidity estate, and costly and risky claims litigation will be avoided.

9  **III.**

10  **CLAIM OBJECTIONS, AVOIDANCE ACTIONS, AND ADDITIONAL RECOVERIES**

11          On June 14, 2006, the Trustee filed his first omnibus claim objection. Both the deadline to

12  respond to and the consolidated hearing on these claim objections have passed, and upon entry of an

13  order approving the claim objections, 53 claims against the four estates totaling approximately

14  $4,260,251.76 will be disallowed. By the time of the status conference currently scheduled for

15  September 28, 2006, the Trustee will have filed his second omnibus claim objection which will

16  address approximately 180 additional claims.

17          Separately, in June of 2006, the Trustee sent out approximately 30 demand letters asserting

18  preference claims against various parties under section 547 of the Bankruptcy Code. On June 30,

19  2006, he filed four different preference complaints. To date, the Trustee has received approximately

20  $50,000 in cash payments from four settling defendants, and he has resolved an additional $200,000

21  in claims asserted against the estates by various preference defendants.

22          The Trustee and his accountants are completing their analysis of inter-company transactions

23  between the Debtors and their non-debtor affiliates. He believes that such transactions -- as of the

24  time of the Debtors' bankruptcy filings -- left a balance owing from non-debtor entities and insiders

25  to one or more of the Debtors. To the extent this inter-company analysis shows such a balance due

26  and owing, the Trustee will seek the recovery of such balance from the appropriate entity.

27  Additionally, the Trustee has authorized the undersigned counsel to prepare a complaint to be filed

28  against certain insiders of the Debtors (including Dr. Guess; XIS; and Xelan, the Economic

8

1  Association of Health Professionals, Inc.) asserting claims for indemnity, contribution and other

2  applicable bases for recovery.  That complaint will be pursued depending on resolution of claims

3  objections and on the result of continuing plan discussions with insiders of the Debtors, principally

4  Dr. Guess.

5  **IV.**

6  **NECESSARY PREDICATES TO A PLAN AND GLOBAL RESOLUTION**

7  While the Trustee intends to file a plan of reorganization or orderly liquidation in the near

8  future, he believes doing so prior to resolution of the following key issues would be wasteful of

9  estate assets:

10  **A.**    **IRS Claims**

11  Prior to the commencement of these bankruptcy cases, the Debtors experienced well-

12  publicized difficulties with the IRS.  Before the Trustee's appointment, the Debtors initiated an

13  adversary proceeding against the United States of America and the IRS, pursuant to Bankruptcy

14  Code section 505, seeking a Court determination of the Debtors' liability for federal taxes, even

15  though the IRS had not filed any proofs of claims in the cases.  On December 16, 2004, the IRS filed

16  proofs of claims against the estates of Xelan and Pyramidal asserting estimated claims for income

17  taxes and various penalties totaling almost $500,000,000, including approximately $14,000,000 of

18  income tax claims which the IRS claimed were entitled to priority treatment pursuant to Bankruptcy

19  Code section 507(a)(8).  The IRS claims represent the greatest financial challenge and hurdle to

20  successful reorganization and resolution of the Debtors' bankruptcy cases.  Until a successful

21  resolution is reached on the IRS priority claims, no funds are available to distribute to general

22  unsecured creditors in any of the cases.

23  The Trustee and his professionals have engaged in extensive informal discovery and

24  negotiations with the IRS with the aim to resolve the IRS claims.  Subject to documentation of a

25  definitive agreement, these negotiations have recently resulted in an agreement with the IRS that will

26  fix and allow the IRS's tax claims entitled to priority treatment pursuant to Bankruptcy Code section

27  507(a)(8), in the following amounts:

28  / / /

1    Xelan:        $71,237.00 (reduced from $4,146,620); and

2    Pyramidal:    $0.00 (reduced from $10,447,850)

3    The parties will submit a written stipulation to this effect to the Court shortly.  The IRS will also file

4    an amended proof of claim, reducing its unsecured penalty tax claims to approximately

5    $430,000,000 against Xelan and to approximately $1,132,000 against Pyramidal, which claims will

6    remain subject to objection by any party in interest in these cases, and which the Trustee asserts

7    should be subject to subordination to general unsecured claims.

8    **B.    Insurance Company Claims**

9            Several insurance companies filed large claims against the Pyramidal estate.  These claims

10   include various component parts, but primarily assert claims for reimbursement of alleged damages

11   and asserted related legal fees and costs allegedly incurred by the insurance companies arising out of

12   claims they say have been and may be asserted against them by insurance contract clients of the

13   Debtors.  Essentially, the insurance companies assert that Pyramidal is contractually obligated to

14   indemnify the insurance companies under provisions of agency agreements between the parties.  The

15   Trustee and his professionals are analyzing such claims, and intend to commence formal discovery

16   to aid their discussions with representatives of the insurance companies aimed at achieving a

17   consensual resolution of the claims.  Much of the insurance company claims are contingent in

18   character and are subject to objection on that basis.  The Trustee is also investigating grounds to

19   assert claims back against the insurance companies for indemnity.  Absent a favorable resolution,

20   these insurance company claims, if allowed, have the potential to exhaust most if not all assets of

21   Pyramidal.

22   **C.    Dr. Guess and Issues of Consolidation and Subordination**

23           The Trustee believes that any resolution of the IRS claims described above should be coupled

24   with a resolution of claims -- both held by and asserted against the estates -- involving Dr. Guess and

25   the affiliated non-debtor entities (e.g., XIS and/or the Association).  At the moment, the Pyramidal

26   estate holds most of the cash, and it also holds the right to receive future commission income on

27   account of insurance contracts.  If the IRS penalty claims can be reduced substantially (through the

28   claim objection process, or through negotiated resolution with the IRS), all Pyramidal creditors may

1   be able to be paid in full, assuming also a favorable resolution of the insurance company claims

2   discussed above.  In such a case, excess assets or net equity would remain for Pyramidal's equity

3   security holders, listed in Pyramidal's schedules as Dr. Guess (holding 67,000 shares), Xelan

4   Foundation (holding 33,000 shares, which entity was in turn owned by Dr. Guess), and Graham

5   Guess (holding 1 share).  The Trustee's aim, however, is to achieve a global resolution of all claims

6   and interests in these cases, which will require that Dr. Guess and other equity holders waive any

7   rights to distributions on account of equity in Pyramidal, and which will allow such excess funds to

8   be used to pay creditors in other estates -- paying those creditors as close to 100-cents-on-the-dollar

9   as possible.  Such a global resolution is achievable most quickly with the consent of both the IRS

10  and Dr. Guess.  The longer and more expensive path to such a resolution is through litigation

11  seeking substantive consolidation.  The Trustee believes that a consensual global resolution of the

12  cases will achieve the best possible outcome for creditors in the shortest possible period of time for

13  the least cost.

14       If the current discussions break down, the Trustee understands that litigation must be

15  commenced to achieve payment to all creditors, including those who hold claims against Xelan, and

16  not just to those few remaining who hold claims against Pyramidal.

17                                         **V.**

18  **FUNDS DISTRIBUTED TO DATE, CURRENTLY ON HAND, AND PROJECTED TO BE**

19                                   **RECEIVED**

20       Between the time of his appointment and June 30, 2006, the Trustee has distributed

21  approximately $3,146,621 to the Counselors whose settlements have been approved by the Court, as

22  described above.

23       As of August 31, 2006, the Trustee holds the following funds on behalf of the estates:

24       (a)    Xelan        $470,551

25       (b)    Pyramidal    $1,634,235

26       (c)    Financial    $38,021

27       (d)    Pension      $65,846

28

                                          11

1  The Trustee also holds additional deposits totaling $821,340 in Qualified Settlement Funds, pursuant

2  to the Court's order entered September 20, 2005.

3        In addition to the foregoing funds, the Trustee anticipates collecting approximately another

4  $6,000,000 over the next 20 years through the commission renewal income stream, of which

5  approximately $4,200,000[2] will be paid out to various counselors, and approximately $1,800,000[3]

6  will be retained by the Pyramidal estate.

7                              **VI.**

8                          **CONCLUSION**

9        These cases have now moved from the collection and liquidation of assets phase into a

10  winnowing and addressing of claims phase.  Substantial claims, both in number and amount, have

11  just been resolved favorably to the estates as a result of the first round of claims objections.  The

12  Trustee will be resolving more claims shortly as the second round of claims objections runs its

13  course.  Key priority claims of the IRS are in the process of being fixed and allowed by agreement.

14  As the claims become fixed, the Trustee will be in a position to move the cases forward into the plan

15  disclosure statement and confirmation stage.  That process can take several paths, depending on the

16  involvement (or opposition) of key players, including most importantly, the non-debtor insiders and

17  the IRS, and in important but lesser respects, insurance company claimants and Viatical Liquidity.

18        The Trustee's preferred course remains a consensual resolution achieved through multi-party

19  negotiation, participation and contribution.  This approach has proved effective and productive thus

20  far in these cases.  As the cases move through the plan and disclosure process, however, should

21  ///

22  ///

23  ///

24  ///

25

---

26  [2] This figure represents a gross amount due to counselors, of which 20 percent will be paid to Viatical Liquidity on

27  "electing counselor" distributions.

28  [3] This figure represents a gross amount, and does not account for the potential 20 percent reduction in the event that the
Viatical Liquidity settlement is approved by this Court.

1    parties prove intransigent and progress stall, the Trustee is prepared to and will proceed along a

2    litigation path in order to achieve the desired end -- namely, as close to a 100 percent payment

3    distribution to non-insider general unsecured creditors.

4

5    Dated:        September 7, 2006                SULLIVAN, HILL, LEWIN, REZ & ENGEL
                                                  A Professional Law Corporation
6

7                                                 By:        _/s/ James P. Hill_____
8                                                         James P. Hill
                                                         Attorneys for William A. Leonard, Jr.,
9                                                         Chapter 11 Trustee

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28